## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Jayton Simms,

                        Plaintiff,

v.

Grant Lissick and Sam Sarsfield,
in their individual capacities
as Hennepin County Deputies,

                        Defendants.

Case No. _____

**COMPLAINT**
JURY TRIAL DEMANDED
UNDER FED. R. CIV. P. 38(b)

For his Complaint, Plaintiff Jayton Simms ("Simms") hereby states and alleges as follows:

### <u>Introduction</u>

1.      This is an action for money damages for injuries sustained by Simms from the use of excessive force by Defendants Grant Lissick and Sam Sarsfield, Hennepin County corrections deputies, in violation of Simms's well-settled federal civil rights.

2.      On February 27, 2024, Simms was upset to be locked into his cell at the Hennepin County Adult Detention Center (the "Jail") and, in protest, hung his arm out of the food-pass slot in his cell door during nursing rounds to prevent staff from securing it shut. Lissick yanked the cell door open with Simms's arm still in the slot, and then punitively slammed the door while Simms's foot was in the door frame, bearing his full body weight on the door for good measure, and breaking Simms's fibula.  Lissick and Sarsfield then entered the cell and further assaulted Simms.  To a reasonable observer, the assault of a black inmate

by two white deputies could well be perceived as a racially motivated assault, and Simms certainly viewed it that way.

3.     This action arises purely under the Fourth and Fourteenth Amendments to the United States Constitution.  State-law claims and, by consequence, the limitations and defenses under state law, are not applicable to this civil-rights lawsuit.

4.     Simms brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth and Fourteenth Amendments, and 28 U.S.C. §§ 1331 and 1343(a)(3). These statutory and constitutional provisions vest the Court with original jurisdiction over this matter.

5.     The events giving rise to this action occurred in the City of Minneapolis, County of Hennepin, State of Minnesota. Venue is thus proper under 28 U.S.C. § 1291(b)(2).

## The Parties

6.     Simms is, and was at all material times, a citizen of the United States and a resident of the State of Minnesota.  He was a pretrial detainee at the Jail on the date of the incident.

7.     Defendant Lissick was at all material times a citizen of the United States, a resident of the State of Minnesota, and employed by Hennepin County as a deputy in the Jail. He is sued in his individual capacity.

8.     Defendant Sarsfield was at all material times a citizen of the United States, a resident of the State of Minnesota, and employed by Hennepin County as a deputy in the Jail. He is sued in his individual capacity.

**The Assault**

9.      At approximately 8:15 pm on February 27, 2024, Sarsfield was accompanying a nurse on rounds through Simms's housing unit, Quad 9A, at the Jail.

10.     Simms was upset about being locked in his cell for the night due to earlier behavior.

11.     When Sarsfield and the nurse approached his cell, Simms stuck his right arm through the food-pass slot in violation of Jail rules, preventing Sarsfield and the staff from being able to secure it shut.



12.     Simms had a cast on his right arm at this time due to a prior injury to his wrist and thumb.

13.     At 47 years old, with a height of 5'3" and weight of 147 pounds, Simms is physically smaller and less imposing than most inmates at the Jail.  He also suffers from several chronic health conditions, including diffuse brain atrophy, osteoarthritis, seizure disorder, bipolar disorder, depression, deformities in his thoracic and lumbar vertebrae, and chronic pain in his hip and back.  At the time of his interaction with deputies, he was using a wheelchair due to the degenerative arthritis and advanced avascular necrosis in his left hip.

14.     Sarsfield reported that he "kindly" asked Simms multiple times to put his arm back inside the cell.  Surveillance footage shows him crouching down to speak to Simms.

15.     This interaction between Sarsfield and Simms appeared calm and without exigency.

16.     After a few unsuccessful attempts, Sarsfield and the nurse walked away from the cell.

17.     Simms's arm remained hanging out of the food-pass slot.

18.     Sarsfield informed Lissick and Deputy Reme about Simms's conduct.

19.     Within fifteen seconds of Sarsfield walking away from Simms's cell, Lissick can be seen walking towards Simms's cell with purpose.  He was a man on a mission.



20.    In violation of policy, Lissick chose not to activate his body-worn camera, despite knowing he was about to engage with an inmate who was violating Jail rules.

21.    Lissick did not bother with words when he got to Simms's cell.

22.    Without any apparent warning or discussion, Lissick yanked the cell door open.



23.     Sarsfield trailed behind Lissick, witnessing his punitive use of force.

24.     Like Lissick, Sarsfield chose not to activate his body-worn camera.  He made this choice, in violation of Jail policy, even after seeing Lissick start to use force on Simms.

25.     After Lissick opened the door, Simms stuck his left foot in the cell doorway.

26.     Lissick slammed the cell door shut on Simms's leg, leaning against the door with his full body weight for good measure and lifting his knee up to the food-pass slot to try to prevent Simms from placing his arm in it.





27.     Sarsfield watched all of this happen and failed to intervene.

28.     Lissick then opened the door to the cell.

29.     Simms was sitting in his wheelchair at the entryway to his cell.

30.     Simms had both feet on the ground at this time.

31.     Lissick then lunged towards Simms—who, it bears repeating, *was sitting in a wheelchair with his arm in a cast*.

32.     Simms continued to have both feet on the ground, even after Lissick began lunging aggressively toward him.



33.     The deputies engaged in a classic two-versus-one formation against a defenseless Simms.

34.     Simms was knocked backward into his cell from the force of Lissick's lunge and tackle.

35.    Lissick, still in the doorframe, then lunged again toward Simms and disappeared deeper into the cell, beyond the view of Jail surveillance cameras.

36.    Sarsfield entered the cell after Lissick.

37.    After he was flipped out of his wheelchair, Simms was punched and kicked multiple times by the deputies.

38.    Each deputy was personally involved in the assault and used force against Simms.

39.    Simms described to Jail medical personnel after the assault that Lissick "jumped on [him]," and the two deputies "stomped" him.

40.    Two inmates came out of their cells and attempted to look into Simms's cell, obviously having heard the assault.



41. Lissick exited the cell after about fifteen seconds and started to close the door, but then appeared to change his mind and moved back toward the cell, standing in the doorway.

42. A third deputy approached the cell and witnessed what was occurring inside it.



43. Lissick and Sarsfield left Simms's cell forty seconds after first entering it, accompanied by the third deputy. By that point, the damage was done.

**The Injuries**

44. The Jail's on-duty nurse, Reggie Pagaduan, tried to check on Simms after the assault, but having just been assaulted by Jail employees, Simms refused, telling the nurse to get away from him and that he didn't want to talk to him.

45. On February 29, Simms was evaluated by Susan Johnson, APRN, CNP.

46.    He explained to Nurse Johnson that he "got slammed" in the door and a deputy jumped on him.

47.    During this visit, Simms reported pain across his left side: in his calf, neck, shoulders, ribs, and jaw.

48.    Simms couldn't open his mouth wide due to the pain.

49.    Nurse Johnson noted a small lump on the left side of Simms's lower mid jaw, as well as swelling in his lower left leg and tenderness in his abdominal region.

50.    Imaging was ordered at the Jail: an x-ray of his facial bones due to his jaw pain, an x-ray of his c-spine due to his neck pain, and an x-ray of his left tibia and fibula due to his lower leg pain.

51.    The c-spine imaging was normal, and while the imaging of his facial bones showed "no convincing acute fracture," the technician noted that a CT scan would be better able to detect a non-displaced fracture in his jaw.

52.    The imaging on his left leg showed a new proximal fibula fracture.

53.    This means that when Lissick chose to shut the cell door on Simms's left leg, he did so with enough force to break the bone.

54.    Simms was taken to the emergency department at Hennepin County Medical Center the next day, March 1, 2024, for a full workup.

55.    At the hospital, he continued to report pain in his jaw, ribs, abdomen, and lower left leg, as well as numbness in his left leg.

56.    Simms explained to hospital personnel that his cell door was slammed shut on his left leg and that deputies then entered his cell and were "stomping on his legs, his ribs and his neck."

57.    Simms underwent a CT scan of his chest, abdomen, and pelvis, as well as a CT scan of his thoracic and lumbar spine, which came back normal (besides the preexisting deformities in his vertebrae).

58.    The final clinical impression of the emergency department physician who evaluated Simms was "consistent with assault."

59.    Simms was given a cam boot to wear and was instructed to be non-weight bearing for one month.

60.    Over two weeks after the assault, Simms reported to the on-duty Jail nurse on March 15, 2024, that his ribs were still very painful whenever he coughed, laughed, or breathed deeply.  Consistent with his previous reports, he explained his rib pain was due to a deputy "jumping" on him.

61.    When seen by Jail medical personnel on March 23, Simms was still experiencing a "throbbing," 7 out of 10 pain in his left leg.

62.    More than a month after the assault, Simms reported continued, constant pain in his ribs that was not changing.

### The "Investigation"

63.    Hennepin County claims to have investigated the incident involving Simms.

64.    Lissick and Sarsfield wrote incident reports, and the housing supervisor on duty, Deputy Derek Lande, wrote a supervisor report.

12

65.    In a bald attempt to inject drama into the incident and paint their use of force as justified, both Lissick and Sarsfield incredibly describe the incident as a **hostage** situation—that is, Simms taking the *food pass* "hostage."

66.    In his report, Lissick nonsensically explained that "due to the security risk of having the food pass [sic] I walked into 9A to secure it."

67.    Lissick fails to explain the "security risk" of an unsecured food-pass slot or how that risk could possibly warrant breaking an inmate's leg to address it.

68.    Lissick's and Sarsfield's reports are consistent with each other, as are the demonstrable lies contained therein—evincing an effort to cover up the assault.

69.    Both deputies lied about Lissick yanking the door open with Simms's casted arm still in the food-pass slot.

70.    Lissick claimed he opened the door and then Simms "pulled his arm back thru the foodpass."

71.    Sarsfield claimed Lissick opened the door and "guided" Simms's "casted arm back into the cell."

72.    Yet the video evidence shows Lissick yanking the door open without regard for Simms's arm.

73.    Both deputies also lied about Lissick slamming the cell door on Simms's leg—conveniently omitting that detail.  They both admit that Simms's leg was in the doorway but omit *any* use of force by Lissick.

74.    Lissick wrote that Simms "put his legs out of the door preventing staff from closing it," so Lissick then "opened the door further and entered the cell."  There is no mention of the door ever closing.

75.    Sarsfield wrote that as Lissick was attempting to close the door, Simms stuck his leg out to prevent the door from closing, so Lissick "then reopen[ed] the door."

76.    If these reports are to be believed, despite being belied by the video evidence, the door was never closed—but query, then, how did Simms wind up with a broken leg?

77.    Adding to the lies, Lissick reported that after he opened the door, Simms "jumped out of his wheelchair towards staff."

78.    Sarsfield similarly lied that at the point Lissick opened the door, "inmate Sims [sic] stood up and attempted to assault Deputy Lissick."

79.    At no point does the video evidence show Simms jumping out of or standing up from his wheelchair.  That is because it never happened.

80.    The deputies' contrived reports are belied by the video, which shows Simms's two feet on the ground before *Lissick* lunged at *Simms*.

81.    In fact, the video evidence shows Lissick lunging at Simms twice.

82.    As far as what physical force occurred in the cell, away from what the surveillance video could capture (because neither deputy had his body-worn camera on), Lissick claimed he pushed Simms onto his bed but Simms "ended up on the floor during the struggle."

83.     Lissick further claimed that Simms pulled Sarsfield onto the ground, so Sarsfield "delivered 2-3 forearms to his upper torso to create separation," allowing him to safely exit the cell.

84.     Sarsfield agreed that Lissick pushed Simms onto the bed and said that Simms rolled off the bed and wrapped his arms around Sarsfield's legs, making him fall.

85.     According to Sarsfield, Simms was attempting to bite his thigh, so Sarsfield used his "left palm to push his forehead away" and then used a "forearm strike to the side of the inmates [sic] head to create distance." Simms allegedly then pulled onto Sarsfield's uniform shirt to try to pull him to the ground, so Sarsfield stiff armed Simms and "applied 2-3 elbows to [Simms's] stomach and side area," which allowed Sarsfield to safely exit the cell.

86.     The claimed 2-3 forearm or elbow blows to Simms's torso region do not explain the lump on Simms's jaw or the pain that prevented him from opening his mouth in the days after the assault. Nor does it explain the pain along his left side, in his ribs, neck, and shoulder.

87.     According to Lissick's report, the only force he used on Simms was pushing him onto his bed to prevent him from assaulting staff.

88.     Yet, Lissick's right hand knuckle was swollen from the incident with minor bleeding, and he had to get an ice pack from the nurse.

89.     His injuries are not consistent with his claimed use of force, which should have been immediately apparent to the Internal Affairs division of the Hennepin County Sheriff's Office that investigated the incident.

90.     A simple review of the video evidence shows that Lissick and Sarsfield lied in their reports.

91.   It strains credulity that the 5'3", 147-pound man in a wheelchair with one arm in a cast posed such a risk to the two much larger, able-bodied deputies that one of them needed to use 2-3 forearm strikes to break free and "safely" exit the cell.

92.   At the conclusion of its investigation, Internal Affairs determined that a policy violation occurred—but only for Lissick not activating his body-worn camera during the incident.

93.   Lissick received an "oral reprimand" for the failure to turn on his body-worn camera while inflicting physical force on Simms.

94.   He was never disciplined for breaking Simms's leg.

95.   The Internal Affairs investigation was a sham designed to approve the force used by Lissick and Sarsfield.

96.   Like the deputies' reports, the Internal Affairs report of the oral reprimand adopts the deputies' framing of the incident as a "hostage" situation.

97.   Like the deputies' reports, the Internal Affairs report omits the fact that Lissick ever slammed the door on Simms's leg.

98.   The Internal Affairs report takes a victim-blaming approach instead, acknowledging that Simms broke his leg but commenting that it was "the result of the inmate sticking his leg out of the door while it was closing"—a cleverly phrased use of the passive voice that omits Lissick's volitional choice to punitively close the door on Simms's leg and lean into it for added force and effect.

99.   Despite Simms alleging that Lissick flipped him out of his wheelchair and punched and kicked him 10-15 times, the Internal Affairs report found that there was "no

conclusive evidence to prove excessive force was used" because Lissick "affirmed" he did not punch or kick Simms, and his partner "confirmed" that he did not punch or kick Simms.

100. In essence, it was the deputies' words against Simms's, and the County's Internal Affairs division chose to believe its deputies, despite Simms's injuries which competent medical personnel found were "consistent with assault" and despite surveillance video footage casting serious doubt on the deputies' stories.

101. The reason there is no "conclusive" evidence of the excessive force is because Lissick and Sarsfield chose not to turn on their body-worn cameras.

102. Because Lissick opened the cell door, the Internal Affairs report concluded that he was taking "enforcement action," which, by Hennepin County policy, requires deputies to activate their body-worn cameras.

103. Lissick omitted from his incident report that he failed to turn on his body-worn camera, but he admitted he failed to in the Internal Affairs investigation.

104. Despite also participating in the "enforcement action" and entering Simms's cell, Sarsfield similarly chose not to activate his body-worn camera.

105. Sarsfield acknowledged in his report that his body-worn camera was not turned on, justifying the failure "due to speed things progressed and to preserve the safety of my partner and myself."

106. Internal Affairs did not discipline Sarsfield (or even find a policy violation) for failing to activate his body-worn camera.

107.    Internal Affairs did not discipline Sarsfield or Lissick, or even find a policy violation, for the use of physical force that resulted in Simms's broken leg and injuries to his ribs, jaw, neck, and shoulders.

## COUNT ONE

### 42 U.S.C. § 1983 – FOURTH AND FOURTEENTH AMENDMENT VIOLATIONS
### *Plaintiff Simms v. Defendant Lissick in his individual capacity*

108.    Simms realleges and incorporates by reference herein each and every allegation contained above as if set forth fully herein.

109.    On February 27, 2024, Defendant Lissick violated Simms's Fourth and Fourteenth Amendment rights to be free from excessive force by yanking open the cell door when Simms's casted arm was in the food-pass slot and violently shutting the cell door on Simms's leg, breaking his leg in the process.

110.    By the actions described above, Defendant Lissick, under the color of state law, deprived Simms of his clearly established and well-settled rights to be free from excessive force under the Fourth and Fourteenth Amendments to the United States Constitution.

111.    Defendant Lissick subjected Simms to this deprivation of rights either maliciously or with reckless disregard for whether his rights would be violated.

112.    As a direct and proximate result of the acts and omissions of Defendant Lissick, Simms suffered severe injuries, was forced to endure severe pain and mental suffering, and was thereby damaged in an amount to be determined by a jury.

113.    Punitive damages are available against Defendant Lissick and are claimed as a matter of right under federal common law and *Smith v. Wade*, 461 U.S. 30 (1983), and as such,

are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

114.    Simms is entitled to recovery of his costs, including reasonable attorneys' fees under 42 U.S.C. § 1988.

### **COUNT TWO**

**42 U.S.C. § 1983 – FOURTH AND FOURTEENTH AMENDMENT VIOLATIONS**
*Plaintiff Simms v. Defendants Lissick and Sarsfield in their individual capacities*

115.    Simms realleges and incorporates by reference herein each and every allegation contained above as if set forth fully herein.

116.    On February 27, 2024, Defendant Lissick violated Simms's Fourth and Fourteenth Amendment rights to be free from excessive force by entering his cell and assaulting him and otherwise inflicting unreasonable, unnecessary, and gratuitous physical force upon him.

117.    On February 27, 2024, Defendant Sarsfield violated Simms's Fourth and Fourteenth Amendment rights to be free from excessive force by entering his cell and assaulting him and otherwise inflicting unreasonable, unnecessary, and gratuitous physical force upon him.

118.    By the actions described above, Defendants Lissick and Sarsfield, under the color of state law, deprived Simms of his clearly established and well-settled rights to be free from excessive force under the Fourth and Fourteenth Amendments to the United States Constitution.

119.    Defendants Lissick and Sarsfield subjected Simms to this deprivation of rights either maliciously or with reckless disregard for whether his rights would be violated.

120.    As a direct and proximate result of the acts and omissions of Defendants Lissick and Sarsfield, Simms suffered severe injuries, was forced to endure severe pain and mental suffering, and was thereby damaged in an amount to be determined by a jury.

121.    Punitive damages are available against Defendants Lissick and Sarsfield and are claimed as a matter of right under federal common law and *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

122.    Simms is entitled to recovery of his costs, including reasonable attorneys' fees under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jayton Simms prays for judgment against Defendants as follows:

1.    That this Court find that Defendants Lissick and Sarsfield committed acts and omissions violating the United States Constitution, actionable under 42 U.S.C. § 1983;

2.    As to Count One, a money judgment against Defendant Lissick for compensatory and punitive damages in an amount to be determined by a jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988, and prejudgment interest;

3.    As to Count Two, a money judgment against Defendants Lissick and Sarsfield for compensatory and punitive damages in an amount to be determined by a jury, together

with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988, and prejudgment interest; and

4. For such other and further relief as this Court may deem just and equitable.


Dated: May 9, 2025                              **ROBINS KAPLAN LLP**

                                                s/ *Andrew J. Noel*

                                                Robert Bennett, #6713
                                                Andrew J. Noel, #322118
                                                Kathryn H. Bennett, #0392087
                                                Marc E. Betinsky, #0388414
                                                Greta A. Wiessner, #0401130
                                                Julie C. Moroney, #0504300
                                                800 LaSalle Ave, Suite 2800
                                                Minneapolis, MN 55402
                                                Telephone: 612-349-8500
                                                rbennett@robinskaplan.com
                                                anoel@robinskaplan.com
                                                kbennett@robinskaplan.com
                                                mbetinsky@robinskaplan.com
                                                gwiessner@robinskaplan.com
                                                jmoroney@robinskaplan.com

                                                *Attorneys for Plaintiff Jayton Simms*